UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


ARIEL EPHRAIM VARSANYI,          :
                                 :
          Plaintiff              :
                                 :
     v.                          :  CIVIL NO. 3:CV-10-2072
                                 :
JOSEPH J. PIAZZA, *et al.*,       :  (Judge Kosik)
                                 :
          Defendants             :


## MEMORANDUM

Plaintiff, Ariel Ephraim Varsanyi, filed this civil rights action pursuant to 42

U.S.C. § 1983, alleging the violation of his right to free exercise of his religious

beliefs under the First Amendment.  At the time, he was an inmate confined at the

Luzerne County Correctional Facility ("LCCF"), Pennsylvania.  He was released from

prison on or about November 24, 2010.  Remaining as Defendants in this action are

the following LCCF current or former employees: Warden Piazza, Food Supervisor

Jack Renko and Major James Larson. Pending is Defendants' supplemental motion

for summary judgment.[1] (Doc. 77.)  For the reasons that follow, the motion will be

---

[1] The court granted a motion by remaining Defendants Piazza, Larson and
Renko to file an additional/supplemental dispositive motion in this matter.  (Doc. 75.)
Thereafter, a document entitled "Defendants Piazza, Renko and Larson's
Supplemental Brief in Support of Their Motion for Summary Judgment" was
submitted.  (Doc. 77.)  This filing will be construed as both a supplemental motion for
summary judgment and brief in support thereof.

granted.

I.    **Background**

In his complaint, Plaintiff sets forth two claims.  He first contends that

Defendants failed to provide him with an Orthodox Jewish kosher diet.  He further

claims that he was refused visits from an Orthodox Jewish Rabbi and access to

religious materials.

On March 6, 2013, a Memorandum was issued addressing a motion for

summary judgment filed by Defendants.  The court found no disputed issue of fact

with respect to the sincerity of Plaintiff's Orthodox Jewish beliefs, or that the dietary

laws of his faith were an important, integral part of his beliefs.  (Doc. 71,

Memorandum dated 3/6/13.)  It was also undisputed that the standard kosher food

provided by LCCF for the Jewish inmates did not meet the strict requirements of

Orthodox Judaism.  While Defendants set forth reasons why their conduct was

rationally related to a legitimate governmental interest, and why alternative means

existed for Plaintiff to exercise his First Amendment rights, the court found that they

failed to submit evidentiary materials in support of their position.  (*Id.*)  The court also

found disputed issues of fact to exist with respect to the alleged denial of visits from

an Orthodox Jewish Rabbi and the denial of religious reading materials.  As such,

Defendants' motion for summary judgment was denied, and the parties afforded thirty

(30) days in which to submit any further dispositive motions.  The failure to file any

2

properly supported supplemental motions would result in the matter being scheduled for trial.

Pending is Defendants' supplemental motion supported by a second affidavit from Defendant Larson along with supporting exhibits, and an affidavit from Defendant Wilbur.[2] Plaintiff has filed his opposition to the motion. The matter is ripe for disposition.

## II.     Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F.Supp.2d 1086, 1091 (M.D. Pa. 2011)(*quoting* Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

---

[2] Wilbur was previously dismissed from this action due to Plaintiff's failure to litigate the claims filed against him. (Doc. 71 at 1-2, n. 1.)

317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-

moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)). The judge's function is not to weigh the evidence or to determine the truth of the matter; rather, it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

## III.    Statement of Facts

In filing the instant supplemental motion for summary judgment, Defendants incorporate by reference their original statement of undisputed material facts submitted in support of their initial motion for summary judgment. In addressing the earlier motion, the court set forth the undisputed facts as follows, but noted where any facts were in dispute:

> Plaintiff's allegations center around the period of time from his arrival at LCCF on May 7, 2010, through the filing of this action on October 6, 2010. He alleges two (2) violations of his First Amendment right to the free exercise of religion: (1) the failure of LCCF to provide him with a kosher diet which adhered to Orthodox Jewish standards and (2) the denial of a visit from Orthodox Jewish Rabbi Perlman and the denial of access to religious services and reading materials. Plaintiff states that he first notified LCCF through a request slip submitted during the week of May 7, 2010 that he was dissatisfied with the kosher food provided by the prison. He states that he did not receive a response until June 10,

5

2010, wherein a chaplain informed him that his needs would be met. (Doc. 67, Ex. 1.)  Plaintiff states that a second request was sent to Defendant Piazza on July 23, 2010, and that Piazza stated he would try to meet Plaintiff's needs within reason.  (*Id.*, Ex. 2.)

Defendants state that the first notification of dissatisfaction received by Plaintiff with respect to kosher food was in the form of a grievance on July 25, 2010. (Doc. 50, Ex. 1.)  Defendant Renko responded to the grievance the same day and stated as follows:

> Every item in the kitchen is kosher except for the meat.  We will sub for the meat (eggs, peanut butter, cottage cheese, kidney beans and fish) for your protein.  The Rabbi and I talked and consulted over all items in the kitchen.

(*Id.*)  Thereafter, Rabbi Larry G. Kaplan of Temple Israel located in Wilkes-Barre, Pennsylvania, was asked to visit the prison and to speak with Plaintiff. (Doc. 50, Ex. 8, Kaplan Dep. at 5.)  Kaplan ministers to the Jewish inmate population at LCCF. (Doc. 50, Ex. 6, Larson Aff. ¶ 4.)  He offered to look into Plaintiff's kosher food concern and check out the kitchen, including the prison's food storage and preparation areas. On August 1, 2010, Kaplan wrote a letter to LCCF officials and verified Renko's grievance response. (Doc. 50, Kaplan Dep. at 5-6.)  In the letter, he stated as follows:

> I have personally verified that the ingredients used and the preparation methods employed in this facility meet the requirements for a Kosher diet, and therefore declare that any inmate requesting Kosher food can be accommodated according to Jewish Law.

(Doc. 50, Ex. 2.)

Plaintiff then challenged Kaplan's qualifications to certify any food as meeting his Orthodox Jewish kosher requirements, and requested that he amend the letter he submitted. On September 8, 2010 and September 15, 2010, two grievances complaining about the lack of kosher meals were submitted by Plaintiff. (Doc. 67, Exs. 5, 6.)

On September 27, 2010, Kaplan submitted a second letter to Defendant

6

Piazza wherein he stated in pertinent part, as follows:

> . . . I have never suggested that my standards meet the requirements of Orthodox Judaism. In fact, I have absolutely no affiliation with the Orthodox Movement. I am affiliated with the Conservative Movement, and my standards of Jewish Law are based on my interpretation alone.

> . . . I made a number of visits to the LCCF and Mr. Jack Renko, Purchasing Agent, was kind enough to show me the kitchen facilities which I believe are adequate to provide a Kosher diet to Jewish inmates. However, if an inmate will only accept an Orthodox level of supervision, I obviously cannot accommodate that request.

> . . . I cannot see how the LCCF could possibly adapt its kitchen facilities to provide Kosher meals under Orthodox supervision without hiring a full time Mashgiach - a Kosher Law supervisor overseen by an Orthodox rabbi. Any Kosher facility under Orthodox supervision, especially a facility which serves non-Kosher food as well, would need to have a rabbinic-sponsored supervisor present during all aspects of food preparation.

> I can state that fresh fruits and vegetables, hard boiled eggs, and nuts are generally considered Kosher by all Orthodox authorities. There are also many packaged items available with Orthodox supervision indicated on the label available at local food markets. There are Orthodox supervised Kosher frozen meals that are also available locally.

> I am sorry that my level of supervision is not adequate to Mr. Varsanyi. I have an Orthodox colleague in town, Rabbi Zvi Perlman, who is eager to visit the Jewish inmates and provide whatever additional assistance he can. I believe he has tried to become listed on the approved chaplains list at the LCCF and has had difficulty in that regard. I hope his assistance can be accommodated.

7

(Doc. 50, Ex. 3; Doc. 67, Ex. 12.)

On September 27, 2010, Plaintiff filed a grievance alleging that certain religious materials he requested had not been provided to him. (Doc. 67, Ex. 8.) Specifically, the grievance referenced religious services that meet the requirements of his worship, religious materials such as books, and visits from a Rabbi from his religion who has been denied access.

Defendant Larson responded to the grievance on September 29, 2010, as follows:

> To my knowledge you have never been denied or requested religious books from me. The religious horn was allowed to be blown. We have a Rabbi and he has been involved. We have explained to you that we believe we have not violated your rights. The food has been evaluated and it is Kosher according to the Rabbi. We are aware you are an Orthodox Jew but if your demands create an undue burden on the facility we do not have to go to that extent. We respect your religion as we do all others. I don't know what you are talking about regarding the shaving issue. The warden also explained to you on the Block in my presence what his position on the matter is.

(Doc. 50, Ex. 4.)

(Doc. 71 at 6-10, Memorandum dated 3/6/13.)

Following the filing of the supplemental motion for summary judgment, the following undisputed facts are now in the record. The cost of a non-Kosher meal tray at LCCF averages $1.15 per meal. Accordingly, the approximate cost to feed an inmate a non-Kosher tray on a weekly basis is $24.15. Because a standard Kosher diet does not differ in any material respect from what is served for inmates who do not observe the Kosher laws, the cost per inmate per week is also $24.15. (Doc. 77-1

at 3, Larson Aff. ¶¶ 2, 3.)  The cost of providing Plaintiff the type of packaged meals required by his Orthodox beliefs would range between $4.40 to $5.00 per meal.  (*Id.* ¶ 3, Ex. A, Passover Order Form.)  The food budget of LCCF would not permit the accommodation of individual inmates at a cost that was essentially four times more expensive than the cost of a standard Kosher diet.  (*Id.*)

The dietary log book for the period of November 2, 2010 through November 25, 2010 (the date of Plaintiff's discharge) sets forth in detail all of the meals provided to Plaintiff during that time period.  (Doc. 77-1, Larson Aff. ¶ 4, Ex. B, Dietary Log.)  The dietary log sampling establishes that Plaintiff was provided with a wide variety of foods that were Kosher and met with his dietary needs.  Plaintiff argues that standard Kosher foods do not meet his more strict Orthodox requirements due to the manner in which they are stored, handled and prepared.

During the relevant time period, Jim Wilbur was the Chaplain at LCCF.  (Doc. 77-1 at 13, Wilbur Aff.)  While he does not specifically recall what religious texts of the Hebrew faith were maintained at LCCF during Plaintiff's incarceration there, all inmate requests for religious materials were handled in the same way, regardless of the inmate's faith.  If any religious materials were requested by an inmate, including Plaintiff, Wilbur would refer the inmate to an appropriate rabbi or minister to see if the materials could be provided to the inmate.  (*Id.* ¶¶ 1, 2.)  If Plaintiff had advised Chaplain Wilbur for a particular Orthodox Judaism publication, an appropriate

referral would be made to an Orthodox Rabbi who would attempt to assist him. (Doc. 77-1, Larson Aff. ¶ 5.) LCCF does not have sufficient financial resources to purchase reading materials, but does not prohibit religious materials form being given to an inmate. (Wilbur Aff. ¶ 3.) LCCF does not discriminate with respect to providing religious materials to inmates, however, it is up to the inmate to pay the costs or seek donations of the religious materials desired. (Larson Aff. ¶ 6.)

## IV.  Discussion

### A.  First Amendment Exercise of Religion

The First Amendment offers protection for a wide variety of expressive activities. *See* U.S. Const. amend 1. These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). Although prisoners must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment, *see Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment's right to the free exercise of religion. *O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987). Only beliefs which are both sincerely held and religious in nature are entitled to constitutional protection. *Wisconsin v. Yoder*, 406 U.S. 205, 215-19 (1972); *Dehart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000). The law is also clear that a religious practice is protected

10

even if it is not deemed to be mandatory or practiced by every member of the religion. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981)("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."); *DeHart*, 227 F.3d at 56 ("It would be inconsistent with a long line of Supreme Court precedent to accord less respect to a sincerely held religious belief solely because it is not held by others.").

Defendants do not dispute the sincerity of Plaintiff's religious beliefs. The question before the court is whether Defendants' practices violate Plaintiff's right to freely exercise those beliefs when applying the Supreme Court's "reasonableness test." *See Turner*, 482 U.S. at 89; *O'Lone*, 482 U.S. at 349. The test examines four factors: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forth to justify it; (2) whether there are alternative means of exercising First Amendment rights that remain open to the prisoner; (3) the impact that an accommodation of the asserted right will have on guards, other prisoners, and the allocation of prison resources generally; and (4) whether there are alternatives that fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests. *Id.* at 89-91.

The test's objective "is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protect activity." *De Hart*, 227 F.3d at 59. However, prison

officials are not required to choose the least restrictive means possible in trying to

further penological interests, *Thornburgh*, 490 U.S. at 411, and the burden is on the

prisoner to disprove the validity of the regulation or practice. *Williams v. Morton*,

343 F.3d 212, 217 (3d Cir. 2003) *citing Overton v. Bazzetta*, 539 U.S. 126, 132

(2003). While the ultimate burden of persuasion rests with the prisoner, it is the

prison officials' burden to demonstrate a rational connection between the regulation

or decision at issue and a valid penological interest. *Fontroy v. Beard*, 559 F.3d 173,

177 (3d Cir. 2009). "Part of the court's inquiry under *Turner* is whether the

government has satisfied this requirement." *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d

Cir. 2002)(*quoting Waterman v. Farmer*, 183 F.3d 208, 217 (3d Cir. 1999)). If the

government meets its burden, the court considers the other three *Turner* factors, and

analysis of those factors is generally "fact-intensive." *Wolf*, 297 F.3d at 310.

**B.    Merits**

1.    Religious Diet

A prison's failure to provide meals that comply with an inmate's religious

dietary restrictions can give rise to a First Amendment claim. *See Williams v.*

*Morton*, 343 F.3d 212, 215-16 (3d Cir. 2003). There is, under the Free Exercise

Clause, "a constitutional right not to be forced into a Hobson's choice of either eating

food items which offend one's religious beliefs, or eating very little or not at all."

*Norwood v. Strada*, 249 F. App'x 269, 272 (3d Cir. 2007). Inmates also have a

constitutional right to receive a nutritious diet consistent with their religious beliefs. *Johnson v. Horn*, 150 F.3d 276, 283 (3d Cir. 1998). But an inmate's First Amendment rights are necessarily limited by legitimate penological objectives and are not absolute. *Sharp v. Johnson*, 669 F.3d 144, 155 (3d Cir. 2012).

Plaintiff challenges the prison's failure to provide him with Kosher foods which adhered to strict Orthodox Jewish standards. In applying the *Turner* factors, there is no question that the justifications set forth by the prison for failing to provide Kosher food that fails to adhere to the strict Orthodox requirements are rationally related to the legitimate interest in running the prison safely and efficiently. Hiring a full-time Mashgiach (Kosher law supervisor) and establishing and maintaining a completely separate kitchen at the county prison would create a burden on the prison's ability to provide the current level of services to the inmate population and impact the governmental interests in simplified food service, security and budget.

With respect to the second *Turner* factor, the record is clear that Plaintiff had alternative ways of exercising his rights in that he was provided with food considered Kosher by all Orthodox authorities. Such foods included fresh fruits and vegetables, eggs and nuts. Moreover, the food log sampling submitted by Defendants with respect to Plaintiff's meal selections reveal that he received nutritious, healthy alternatives to the non-Kosher meal plan. Examples of the wide variety of foods Plaintiff consumed include the following: oatmeal, eggs, bread, juice, potatoes, fruit,

peanut butter, milk, cold cereal, celery, carrots, tomatoes, bananas, oranges, cottage cheese, salad, beans, pasta, sauce, spinach, cucumbers, rice, and vegetarian chili. The record also lacks evidence that Plaintiff was unable to observe any other tenets of his Orthodox Jewish faith while confined at LCCF.

The impact on other prisoners, staff and prison resources accommodating Plaintiff's request for a diet that adheres to the Orthodox Jewish mandates, is evident, and no available alternatives to the regulation at a *de minimis* cost to valid penological interests. Defendants argue that requiring the prison to change their food service and provide specific diets for specific religious sects would strain limited resources. For example, to offer pre-packaged Orthodox meals would cost four times the cost of providing the standard Kosher diet. While Plaintiff disputes this cost, he comes forth with no evidence to rebut the evidence submitted by Defendants on this point.[3] For these reasons, the court finds that Defendants are entitled to an entry of summary judgment on this claim.

---

[3] In his opposition brief, Plaintiff mostly focuses on addressing the religious diet claim. In doing so, he devotes pages to raising arguments under the Eighth Amendment's Cruel and Unusual Punishment clause and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* However, only claims raised under the First Amendment are pending before the court in this action. Even if RLUIPA claims had been raised in the complaint, monetary damages are not recoverable under RLUIPA, *see Kerry-X [Marshall] v. Pennsylvania Department of Corrections, et al.*, No. 3:12-0351, 2015 WL 1224708, at *8-10 (M.D. Pa. Mar. 17, 2015), and any claims for injunctive relief are now moot in light of Plaintiff's release from prison.

2.    Religious Advisor and Materials

Plaintiff contends that Defendants denied him access to Orthodox Rabbi Perlman and to religious reading materials.  The Constitution does not provide that a religious adviser be provided to cater to every sect/sub-sect in a prison, or that an inmate be provided with the religious adviser of their choice.  *See Blair-Bey v. Nix*, 963 F.2d 162 (8th Cir. 1992), *cert. denied*, 506 U.S. 1007 (1992).  It is undisputed that during the relevant time period, Jim Wilbur was the Chaplain at LCCF.  It is also undisputed that Rabbi Larry Kaplan ministered the Jewish inmate population at LCCF.  While Kaplan was affiliated with the Conservative Movement, as opposed to the Orthodox Movement of Jewish Law, Plaintiff has failed to rebut Defendants' evidence that Kaplan was available to minister Plaintiff, or that he did not provide Plaintiff with a reasonable opportunity for the exercise of his faith.  While Plaintiff may have preferred to be counseled by Orthodox Rabbi Perlman, and the record reveals that Perlman may have attempted to become affiliated with LCCF, but ran into difficulty in doing so, the record does not support that Plaintiff was denied his First Amendment right to practice his Orthodox Jewish beliefs under the counsel of Rabbi Kaplan.  In fact, the record supports that Kaplan attempted to assist Plaintiff with respect to issues he encountered, such as the diet provided at LCCF.

With respect to obtaining religious publications, the undisputed record reveals that although inmates were not prohibited from accessing religious materials, they

15

were required to pay the costs or seek donations of the materials. The prison clearly has a legitimate interest in managing limited financial resources. Moreover, Defendants have submitted affidavits establishing that had Plaintiff made any request for particular religious publications regarding his Orthodox Judaism, an appropriate referral would have been made to an Orthodox Rabbi, who would then attempt to assist him. Plaintiff fails to rebut this fact by demonstrating that requests were submitted for particular publications and refused. To the contrary, in responding to Plaintiff's grievance with respect to the failure to receive certain religious materials, Defendant Larson informed Plaintiff within three (3) days of his filing of the grievance that to his knowledge Plaintiff had never requested religious books from him or been denied the same. (Doc. 50-1, Ex. 4, Response to Grievance.) Plaintiff fails to rebut this with any evidence that he, in fact, did submit any such request for religious materials to any of the Defendants that was denied. For these reasons, summary judgment will also be granted on this claim. An appropriate order follows.